UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| V. ) | CRIMINAL DOCKET NO. |
| ) | 04-CR-30046-MAP |
| JAMES E. SMITH ) | |
| Defendant ) | |

### DEFENDANT, JAMES E. SMITH'S SENTENCING MEMORANDUM

The defendant submits this memorandum pursuant to the Procedural Order of the Court dated May 1, 2006. In accordance therewith, the defendant proposes a non-guideline sentence of two years probation with a special condition of six months on home detention w/electronic monitoring. Inasmuch as the defendant has no resources, he requests that the court not impose any fine. But as the court is mandated to impose restitution, the defendant requests the court to impose restitution in an amount commensurate with his offense.

**I.    Request for Non-Guideline Sentence**

The defendant respectfully requests a non-guideline sentence. In support thereof, the defendant states as follows.

The sentencing guidelines are advisory, not mandatory. United States v. Booker, 125 S.Ct. 738 (2005). Although the sentencing courts now consult the guidelines in an advisory capacity, the court has discretion to consider other factors, including factors that have been previously discouraged or prohibited as appropriate sentencing factors, in order to arrive at a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing. See 18 U.S.C. § 3553(a)(2)(A)(B)(C)(D). "The Guidelines and their policy statements are now factors to be weighed among the other statutory factors." United States v.

Jaber, 362 F. Supp. 2d 365, 369 (D.Mass. 2005). There is no indication in Booker that the Supreme Court favored the now advisory guidelines with special weight. Support for this view is found in Justice Scalia's dissent in Booker:

> Thus logic compels the conclusion that the sentencing judge, after considering the recited factors (including the guidelines), has full discretion, as full as what he possessed before the act was passed, to sentence anywhere within the statutory range. If the majority thought otherwise – if it thought the Guidelines not only had to be 'considered' (as the amputated statute requires) but had generally to be followed – its opinion would surely say so.

Booker, supra at 791 (Scalia, J. dissenting). If the remedial majority felt that the guidelines were to be given substantial weight, or that a non-guideline sentence was to be imposed only upon a showing of clearly identified and persuasive reasons, it would have said so. Accordingly, the defendant respectfully suggests that allowing "substantial weight" to the sentence suggested by the guidelines, coupled with a requirement of a showing of "clearly identified and persuasive reasons" for the imposition of a "non-guideline" sentence, establishes a constitutionally infirm sentencing calculus in violation of the mandate of Booker and 18 U.S.C. § 3553(a). Accordingly, the defendant submits that he be sentenced in accordance with 18 U.S.C. § 3553(a)(2).

Pursuant to 18 U.S.C. § 3553(a)(2), the Court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in the statute at § 3553(a)(2), i.e., (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

In considering an appropriate sentence that is no greater than necessary to meet the

purposes of sentencing, the court must consider the guidelines that the court finds are the appropriate calculations.

### The Guideline Range

Probation has calculated the guidelines to be level 14, CHC I for a range of 15 – 21 months. This calculation includes a two-level enhancement for "Abuse of Trust." The defendant has objected to this enhancement because an application note to §2S1.1 precludes the application of any Chapter Three adjustments to the underlying offense from which the funds were derived. As the guideline is calculated under the Money Laundering guideline, Chapter three adjustments are to be applied only to the Money Laundering counts. In the instant case, Smith is convicted of 18 U.S.C. §1957, monetary transactions. The offense essentially involves "the withdrawal of funds, such property having been derived from a specified unlawful activity, which is wire fraud" Count 69. The defendant is not charged with what is traditionally known as "layering" (i.e., taking the proceeds from a specified unlawful activity and re-investing in the criminal activity.) Nor was there any evidence for such behavior. The mere placing of fraudulent funds into a financial institution is a violation of 18:1957. The defendant cannot have abused anyone's trust by accepting his usual broker's fee and placing the fee in the bank. By removing the enhancement, the total offense level results in a level 13 and not 14.

Accordingly, the defendant contends that the guideline range before any departures is offense level 13 and CHC at I of 12-18 months.

### Grounds for Departure Under the Guidelines

USSG § 2B1.1(n.18(C)) suggests an encouraged departure when the offense level substantially overstates the seriousness of the offense. Whatever loss amount the government seeks to hold the defendant accountable for under relevant conduct substantially overstates the

$6000 the defendant realized for his part in the offense. The defendant is personally accountable for three properties in the offense. Smith personally owned two of the properties, for which he paid the mortgage and attempted to rehabilitate. They went into foreclosure when Smith had to close his business and file for bankruptcy.

The other transactions that involved Springfield Mortgage did not benefit the defendant, but were funds either placed back into Springfield Mortgage or were retained by Smith's office manager, Paul Starnes. The defendant had nothing to do with the other transactions that involved Springfield Mortgage. The court should consider a three-level downward departure for loss overstating the seriousness of the offense. The resulting offense level 10, CHC I yields a guideline range of 6 – 12 months.

### Nature and Circumstances of the Offense

In considering the nature and circumstances of the offense and the characteristics of the defendant, it is noted that although the government claims that the fraudulent loan scheme began in 1995 and involved 96 (or more recently 101) properties named in the indictment, the defendant's participation was short-lived and he is personally responsible for only a fraction of the properties. Most of the transactions that involved Springfield Mortgage were the responsibility of the man Smith hired to manage the business, Paul Starnes. During that time, Smith stepped away from the business and began buying and rehabilitating properties himself. Although he still owned Springfield Mortgage, he no longer involved himself in the day-to-day business. The defendant avers that taken as whole, he is among the least culpable offenders in the entire conspiracy. He benefitted by $6000, the sum of the fees he received for three properties. Moreover, his role in each transaction was not a crucial one. The investors could have, and did,

find other mortgage brokers to bring the fraudulent documents for submission to lending institutions.

### James Smith's Personal Characteristics

Jim Smith is a 44 year-old father of three children and son of a career U.S. Air Force sergeant. Born in California, the defendant was reared in Springfield, MA since the age of five under difficult circumstances. Although economically secure, the defendant's parents fought incessantly, both verbally and physically, and finally divorced when the defendant was 9 years old. Smith and his five siblings lived with their mother who provided no guidance or security for the children. The mother moved the children to various apartments in the city with the result that the defendant attended five different elementary schools. The mother's boyfriends were no help as role models. When Jim and his three brother got into trouble she would call their father who would come over and "beat up" the children. Perhaps as a result of the abuse, Jim's older brother, Isaac, suffers with pervasive mental illness. When the defendant was in high school, he went to live with his father. That episode was short-lived as the father was physically abusive.

At the age of 15, Smith left home, quit school, lied about his age and got a job at Valley Steak House. The mother of his then girlfriend, Rosa Johnson, took pity on Smith and invited him live in her basement. The couple married when Smith was 19 years old and moved to their own apartment in Springfield. Smith worked two jobs to maintain the family, but the relationship was rocky and the couple separated several times. Among other jobs Smith took to support the family, was a store manager for "Rent A Center" in Haverill, MA; in 1990 the couple moved back to Springfield and Jim worked for the Bertera car dealership. Most telling, Smith later started a publishing company to disseminate business information to the black community in Springfield. But Smith's venture collapsed in 1992 and he and Denise separated. After two

children and several breakups, the couple eventually divorced in 1999. While Smith wanted custody of his children, Rosa was awarded custody and Smith paid child support $1500 per month.

In 1997 Smith began a live-in relationship with Denise Victory, a woman he had known in Springfield since childhood. Shortly thereafter, Smith's son, James, came to live with the couple. Later, in 1998, Jim's daughter, Joyclyn joined the new family. Eventually Smith and Victory had a child together, Joquam Victory. The family (initially, without Joyclyn) moved to Baltimore, MD in 2002, where they both work to try to maintain a living for their children. Denise writes:

> Jim is a great father and has always put his children before himself. His children James, Joyclyn and Joquam adore him. When our companionship grew strong and we began to build a life together at the end of 1997, it was then that Jim's son, James, lived with us until he graduated from high school. The bond that he has with James is like no other father/son relationship that I have ever witnessed. He has a deep love and commitment to his well being. Jim and I have a son that is now seven years old, and they too have a close bond....James is now 24 years old, but prefers to live in Baltimore so that he can be closer to his father. Jim also shares a similar bond with his daughter, Joyclyn, who decided she wanted to live with us in Baltimore two years ago. She is entering into the 11th grade. Our son, Joquam, who is entering into grade two, is also cared for and protected by his father. Jim has provided all of his children with private school education experiences, thus far. For his children, Jim is a pillar.

Jim Smith has always had a deep concern for the misfortunes of others. It was his desire to help the poor black community in Springfield that motivated him to start the publishing company aimed at the black business community. Even his entry into the mortgage business began with altruistic motive. Unfortunately, it deteriorated into fraud. Nevertheless, his concern for others is enduring. Denise Victory tells of Jim's most recent attempts to help a friend, in spite of Jim's dire financial situation:

> Most recently, for months, he has housed and fed a friend who did not have anywhere to stay without asking for anything in return. He did this after being indicted and without a "steady income flow" himself...Since then, Jim has created odd jobs for himself as well as

for acquaintances that did not have a job. He did this so that he could support his family and help others he knew [were] without work and not strip them of their dignity with a "hand out." Jim gives way more than he receives from others and he always sees the positive in everything he does. Although the past two years has put a strain on our relationship and has tested our faith in each other, I believe in his dreams and his goals. Therefore, I believe in him. That is why I have and will continue to endure the affects of the indictment situation.

The Sentencing Commission currently uses the criminal history measure as a tool to measure offender culpability, to deter criminal conduct and to protect the public. USSG Ch. 4, Pt. A, intro. comment. It is noteworthy that the criminal history purposes mirror the purposes laid out at § 3553(a)(2). Thus, it is not inconsistent with the purposes of § 3553(a) to look to the defendant's criminal history in arriving at a just sentence.

In the instant case, the defendant has zero criminal history points. A recidivism study conducted by the Sentencing Commission has found that an older, married person with family ties, who does not use drugs, who has an employment record and who is in Criminal History Category I has a very good chance of not recidivating. See <u>May 2004: Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines</u> available on the Commission's website available at www.ussc.gov/publications/research.

In formulating a sentence no greater than necessary to meet the purposes of punishment, the court must consider the advisory guideline, which the defendant suggests is a level 10, after the court's finding of a ground for departure.

Whether the court chooses to impose a guideline sentence that includes probation, or a non-guideline sentence, the purposes of sentencing can well be served by placing Jim Smith on probation for two years with a special condition that serve six months on home detention. That way he will be punished, but not crippled in his attempt to maintain his family and continue

working. The defendant respectfully requests that the court not impose a fine and to impose restitution in an amount not greater than $6000.

THE DEFENDANT
By His Attorney


/s/ Jack F. St. Clair
Jack F. St. Clair, Esq.
73 Chestnut Street
Springfield, MA 01103
(413) 737-5000
BBO# 438100

## CERTIFICATE OF SERVICE

I, Jack F. St. Clair, hereby certify that I served a copy of the foregoing motion on all parties of record on September 21, 2006.

/s/ Jack F. St. Clair

Jack F. St. Clair, Esq.
